STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

CHRISTA HALL (CABN 328881)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Christa.Hall@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | ) CASE NO. 3:22-mj-70795-MAG |
|---|---|
| Plaintiff, | ) |
| | ) **UNITED STATES' MEMORANDUM** |
| | ) **IN SUPPORT OF DEFENDANT MURILLO'S** |
| v. | ) **PRETRIAL DETENTION** |
| | ) |
| ALEX MURILLO, | ) |
| | ) |
| Defendant. | ) |

    The United States Attorney has charged Mr. Murillo with two counts: Count One, possession with intent to distribute fentanyl, a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and Count Two, possession with intent to distribute methamphetamine, a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii). Mr. Murillo appeared for his initial appearance on June 22, 2022. Mr. Murillo is currently scheduled to appear before the court for a detention hearing on June 28, 2022. The government requests that Mr. Murillo be detained pending trial because Mr. Murillo is a danger to the community and a flight risk. A rebuttable presumption exists in this case that no condition or combination of conditions will reasonably assure Mr. Murillo's appearance as required for the safety of the community, primarily based on Mr. Murillo's intent to sell fentanyl in violation of the Controlled Substances Act. *See* 18 U.S.C. § 3142(e)(3)(A).

## I. BACKGROUND

**a. On March 23, 2022, Mr. Murillo Sold Approximately 2.0 Grams (Gross) of Fentanyl**

On March 23, 2022, DEA TFO Gomez was on duty and assigned to the Narcotics Division and observed Mr. Murillo, a known/documented narcotics trafficker, on the BART stairs at the northeast corner of 8th and Market Streets in San Francisco. She knew Mr. Murillo from numerous prior police contacts and narcotics related arrests in both San Francisco and Oakland. She often observed Mr. Murillo in the area of 8th and Market Streets in the morning and early afternoon hours. This is an area in which narcotics are frequently bought and sold at all hours of the day and night.

At approximately 2:11 p.m., an SFPD Officer assigned to the Narcotics Division was working in an undercover capacity (UC-1) to purchase narcotics on the street. Another SFPD officer was working as the UC-1's close cover surveillance/protection officer. Numerous other SFPD officers were also in the area assisting in this investigation.

The UC-1 asked Mr. Murillo if he had any "Yellow." Based on TFO Gomez's training and experience, "yellow" is a word often used on the street to refer to fentanyl. Mr. Murillo asked the UC-1 how much he wanted, and the UC stated he wanted forty dollars' worth. Mr. Murillo told the UC-1 that he was going to hook him up with two grams and stated that the fentanyl he was selling was "Strong shit." Mr. Murillo handed the UC-1 several chunks of a pressed off-white powder substance, which based on the training and experience of the UC-1, he believed to be fentanyl. The UC-1 gave Mr. Murillo $40.00 of city funds in the form of United States currency. The UC thanked Mr. Murillo and asked Murillo for his phone number so he could buy more drugs from him in the future. Mr. Murillo gave the UC-1 his phone number, and the UC-1 used his SFPD department issued cell phone to text Mr. Murillo his name.

Following this interaction and narcotics transaction, the UC-1 left the area. SFPD officers subsequently weighed the suspected fentanyl (approximately 2.0 grams gross). SFPD officers also

conducted a presumptive test using an SFPD-issued TruNarc Analyzer on the suspected fentanyl, with positive results for the presence of fentanyl.

**b. On April 7, 2022, Mr. Murillo Sold Approximately 5.2 Grams (Net) of Fentanyl**

On April 07, 2022, UC-1 used his SFPD issued cell phone to contact Mr. Murillo. UC-1 told Mr. Murillo that he wanted to buy $100 worth of fentanyl from him for "his cousin." Mr. Murillo agreed to meet UC-1 in United Nations Plaza, where they had previously met.

Two UC's met Mr. Murillo near 8th and Market Streets in San Francisco. UC-1 and UC-2 approached Mr. Murillo and UC-1 introduced UC-2 as his cousin. UC-2 told Mr. Murillo that he heard Mr. Murillo had the good fentanyl and told Mr. Murillo that he would start with one hundred, implying that he wanted $100 worth of fentanyl. Mr. Murillo asked UC-2 what color he wanted, and then he began naming off different colors. UC-1 and UC-2 both responded with "yellow."

UC-1 and UC-2 followed Mr. Murillo down the stairs into BART with him, where Mr. Murillo placed his backpack on the floor and removed a large plastic bag containing multiple individual chunks of what appeared to be fentanyl. Mr. Murillo handed UC-2 multiple chunks of the suspected fentanyl. Mr. Murillo then went into his backpack and told UC-2 to "try this" and removed another large plastic bag of chunks of suspected fentanyl that was purple in color and handed UC-2 some purple fentanyl.

While Mr. Murillo was manipulating his backpack, UC-1 and UC-2 observed various packaged suspected narcotics inside of the backpack. UC-2 provided Mr. Murillo with $100 of city funds in cash, which Mr. Murillo accepted. UC-2 then asked Mr. Murillo for his phone number. Mr. Murillo opened his phone and showed UC-2 his cell phone number. UC-2 was in possession of an undercover cell phone. UC-2 texted the phone number provided by Mr. Murillo on the undercover cell phone, and UC-2 confirmed that Mr. Murillo received the text message on his phone. Mr. Murillo then handed UC-2 his phone and asked him to save his name into his phone, which UC-2 did so. UC-2 told Mr. Murillo that he would contact him to purchase further narcotics, and Mr. Murillo told UC-2 to come back.

SFPD officers subsequently weighed the suspected fentanyl, which consisted of white and purple colored chunky powdery substance (approximately 5.2 grams net). SFPD officers also conducted a presumptive test using an SFPD-issued TruNarc Analyzer on the suspected fentanyl, with positive results for the presence of fentanyl.

**c. On April 21, 2022, Mr. Murillo Sold Approximately 56.1 Grams (Gross) of Fentanyl**

On April 20, 2022, SFPD texted Mr. Murillo via the undercover cell phone and negotiated the purchase of two ounces of fentanyl, one purple and one yellow, for the following day. Mr. Murillo confirmed a price of $750. The next day Mr. Murillo and the UC met near United Nations Plaza. UC-2 advised Mr. Murillo that he had the $750 and confirmed the purchase of two ounces of fentanyl. Mr. Murillo confirmed he had the fentanyl and mentioned multiple colors including "rainbow." According to DEA TFO Alexis Gomez, based on her training and experience, rainbow fentanyl is a new emerging multi-colored fentanyl that has become common in the Tenderloin District of the City and County of San Francisco and is alleged to be stronger in potency.

Mr. Murillo produced a bag of suspected fentanyl that was pink in color. UC-2 asked Mr. Murillo if he could try some, and Mr. Murillo handed UC-2 a chunk of the rainbow fentanyl. Mr. Murillo then utilized his cell phone to type the numbers 750, and showed it to UC-2, which was the amount UC-2 had agreed to pay Mr. Murillo. UC-2 handed Mr. Murillo $750 of city funds, which Mr. Murillo accepted. UC-2 and Mr. Murillo shook hands before UC-2 left the area.

SFPD officers subsequently weighed the suspected fentanyl, which consisted of white colored chunky powdery substance (approximately 28.3 grams gross). SFPD officers weighed the suspected fentanyl, which consisted of purple colored chunky powdery substance (approximately 27.8 grams gross). SFPD officers weighed the suspected fentanyl, which consisted of a pink/red multi-colored chunky substance (approximately 0.7 grams net). SFPD officers also conducted presumptive field tests using the SFPD-issued TruNarc Analyzer on the three different colored samples of suspected fentanyl,

with results for the presence of mannitol.[1] On April 25, 2022, the Alameda County Sheriff's Office Crime Lab tested the fentanyl with a net weight of 27.86 grams and confirmed the drugs contained "fentanyl."[2]

### d. On May 12, 2022, Mr. Murillo Sold Approximately 28.8 Grams (Gross) of Fentanyl and Approximately 51.2 Grams (Gross) of Methamphetamine

On May 11, 2022, SFPD texted Mr. Murillo via the same undercover cell phone and negotiated the purchase of two ounces of methamphetamine and one ounce of fentanyl by using the terms "crystal" for methamphetamine and "yellow" for fentanyl. In a previous text message conversation between the undercover cell phone and Mr. Murillo, Mr. Murillo quoted a price of $200 per ounce for methamphetamine.

On May 12, 2022, the UC-2 and Mr. Murillo met in San Francisco. UC-2 and Mr. Murillo agreed to two ounces of methamphetamine and one ounce of fentanyl for $800.00. Mr. Murillo handed UC-2 a knotted clear plastic bag which contained four additional knotted plastic bags inside, two which contained suspected methamphetamine and two which contained suspected fentanyl. UC-2 handed Mr. Murillo $800 in city funds, which Mr. Murillo accepted.

SFPD officers subsequently weighed the suspected fentanyl, which consisted of white chunky powdery substance (approximately 28.8 grams gross). SFPD officers conducted a presumptive field test using the SFPD-issued TruNarc Analyzer on the suspected fentanyl, which tested clear, with the presence of mannitol. SFPD officers weighed the suspected methamphetamine, which consisted of two knotted plastic bags of a white crystal substance (approximately 51.2 grams gross). SFPD officers conducted a presumptive field test using the TruNarc Analyzer on the suspected methamphetamine, with

---

[1] Mannitol is a common cutting agent which is often mixed with fentanyl to increase the yield. Pure fentanyl is not commonly sold at the street level. Fentanyl is typically cut with a very high ratio of mannitol (or other cutting agent) to fentanyl.

[2] ALCO Laboratory Report No. L22-0831-1. Date received: 04/22/2022. Date of analysis: 04/25/2022.

U.S. DETENTION MEMO  5
3:22-mj-70795-MAG

positive results for the presence of methamphetamine. The Alameda County Sheriff's Crime Laboratory tested the fentanyl and meth on June 9, 2022. The results confirmed the narcotics were positive for meth and fentanyl.[3]

### e. On June 8, 2022, Mr. Murillo Sold Approximately 57.7 Grams (Gross) of Suspected Fentanyl and Approximately 75.7 Grams (Gross) of Methamphetamine

On June 8, 2022, SFPD texted Mr. Murillo in the early morning hours and negotiated the purchase of two ounces of fentanyl and three ounces of methamphetamine. Mr. Murillo confirmed a price of $1400 for the five ounces in total and agreed to meet in front of the coffee shop in United Nations Plaza at 9:00 a.m. UC-2 met with Mr. Murillo.  Mr. Murillo reached into the backpack worn by an unknown male and retrieved a clear plastic bag containing suspected fentanyl and suspected methamphetamine, and he handed it to UC-2. The UC-2 handed Mr. Murillo $1400 cash, which Mr. Murillo accepted. Mr. Murillo and UC-2 shook hands and walked away from one another.

SFPD subsequently weighed the suspected fentanyl, which consisted of white chunky powdery substance in two knotted plastic bags.  The suspected fentanyl weighed approximately 57.7 grams (gross). SFPD officers conducted a presumptive field test using the SFPD-issued TruNarc Analyzer on the suspected fentanyl, which tested clear, with the presence of mannitol.  SFPD weighed the suspected methamphetamine, which consisted of one knotted plastic bag of a white crystal substance.  The suspected methamphetamine weighed approximately 75.7 grams (gross). SFPD officers conducted a presumptive field test using the TruNarc Analyzer on the suspected methamphetamine, which tested presumptively positive for the presence of methamphetamine.

On June 15, 2022, the Alameda County Sheriff's Office Crim Lab examined the meth and fentanyl recovered from this buy. The suspected methamphetamine was determined to contain methamphetamine with a net weight of 73.19 grams.[4]  The suspected fentanyl was determined to contain

---

[3] ALCO Crime Laboratory Report No. L22-1176-1.

[4] ALCO Laboratory Report No. L22-1225-1. Date received: 06/15/2022. Date of analysis:

4-ANPP and Fentanyl with a net weight of 28.53 grams.

**f. On June 21, 2022, Mr. Murillo Was Arrested and in Possession of Approximately 328.7 Grams (Gross) of Suspected Fentanyl and Approximately 105.7 Grams (Gross) of Methamphetamine[5]**

An undercover officer texted Mr. Murillo on June 20, 2022, asking to buy 3 oz. of "yellow" and 3 oz. of "rainbow." Mr. Murillo responded the price would be $2,400. On June 21, 2022, SFPD Officers observed Mr. Murillo exit the front gate of an apartment building in Oakland with a cell phone in his hand and a backpack on his back. Officer Cunningham made contact with Murillo and placed him under arrest without incident. Mr. Murillo's backpack contained the following:

- Suspected fentanyl; TruNarc = mannitol; 328.7 grams gross
- Suspected cocaine base; TruNarc = cocaine base; 47.1 grams gross
- Suspected heroin; not tested; 37.3 grams gross
- Suspected methamphetamine; TruNarc = meth; 105.7 grams gross
- Digital scale
- $41 cash

## II. LEGAL STANDARD

The Bail Reform Act of 1984 permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(B). A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). "[T]he Bail Reform

---

06/15/2022.

[5] SFPD Report No. 220406109.

Act mandates an [1] individualized evaluation [2] guided by the factors articulated in § 3142(g)." *See United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Categorical grants or denials of bail, not tethered to an individualized determination, are impermissible. *Id*. Consideration of factors outside the articulated factors set forth in Section 3142 is also disfavored. *Id*.

Where there is probable cause that a defendant has violated the Controlled Substances Act and faces a maximum of 10 years in person or more (as here), courts apply a rebuttal presumption against the defendant that no condition or combination of conditions reasonably will assure the defendant's appearance as required and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A). Under this scheme, the burden of production then shifts to the defendant. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). Although the presumption is rebuttal, it is not a "bursting bubble." *United States v. Jessup*, 757 F.2d 378, 382-383 (1st Cir. 1985) (Breyer, J.), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990). In other words, the presumption is not so weak that if a defendant introduces evidence, "the presumption 'bursts' and totally disappears, allowing the judge (or jury) to decide the question without reference to the presumption." *Id*. (further stating that such an approach would "render the presumption virtually meaningless" because a defendant can "always provide the magistrate with *some* reason" (emphasis added)). Even if the defendant rebuts the presumption, the presumption is not erased; instead, it remains in the case as an evidentiary finding militating against release that is to be weighted along with other relevant factors. *See U.S. v. King*, 849 F.2d 485 (11th Cir. 1988); *accord United States v. Ward*, 63 F. Supp. 2d 1203, 1209 (C.D. Cal. 1999) (citing *Jessup*, 757 F.2d at 389).

If the court concludes that the defendant has rebutted the statutory presumption of detention, the court must consider four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of

the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

### III. ARGUMENT

Mr. Murillo cannot overcome the presumption in favor of detention. To the contrary, if released pre-trial, he has every incentive to either continue selling fentanyl in the Tenderloin or flee to his home country of Honduras. He is both a danger to the community and a flight risk. There is no combination of conditions that will reasonably assure his appearance or keep the community safe.

> **a. Mr. Murillo is a Danger to the Community as a Professional Drug Dealer Who Targets the Tenderloin Communities with Lethal Drugs that are Fueling an Overdose Crisis**

Mr. Murillo is directly contributing to the "ground zero" of an "opioid overdose crisis" in and around the Tenderloin neighborhood that kills our community's residents when he sells fentanyl and other drugs on the streets.[6] "We are losing over two people a day to drug overdoses, mostly to fentanyl, and mostly in the Tenderloin and SoMa. This is a public health emergency demanding a crisis level response, with massive urgency, coordination, and determination to confront this epidemic."[7] Keeping Mr. Murillo detained will save lives.

Where most people see homelessness and poverty in the Tenderloin, Mr. Murillo sees opportunity. Mr. Murillo capitalized on the addition that sustains his customer base, Mr. Murillo sells for a profit the very drugs that are ravaging the Tenderloin communities. In this case, Mr. Murillo was in possession of approximately 478.5 grams of fentanyl and suspected fentanyl of which he sold approximately 149.8 grams. In addition, Mr. Murillo was in possession of approximately 232.6 grams of methamphetamine and sold approximately 126.9 grams of that amount. The amount of fentanyl found on Mr. Murillo at the time of his arrest alone is extraordinarily dangerous.

Mr. Murillo did not sell narcotics once or twice, but six times. Based on this pattern of behavior,

---

[6] Erin McCormick, *The daily battle to keep people alive as fentanyl ravages San Francisco's Tenderloin*, THE GUARDIAN, April 23, 2022, https://www.theguardian.com/us-news/2022/apr/23/san-francisco-homelessness-street-team-fentanyl (last visited May 6, 2022).

[7] *Supra*, note 6.

it is likely if released, Mr. Murillo would be back out in the Tenderloin selling more fentanyl and methamphetamine. Keeping Mr. Murillo detained will stop him from bringing lethal fentanyl to the community and save lives. Mr. Murillo presents a serious risk to the community and should therefore be detained pending trial. *See* 18 U.S.C. § 3142(e)(3) (rebuttable presumption in favor of detention applies in this case).

### b. Mr. Murillo is a Serious Flight Risk

Not only does Mr. Murillo present a serious risk to the community, but he is also a flight risk. For the first time in his drug-dealing career, Mr. Murillo faces serious consequences. Moreover, the government believes that Mr. Murillo is a Honduran citizen who is in the United States illegally. The prospect of a federal conviction and years in a federal prison provide Mr. Murillo with significant motivation to escape accountability and flee to his home country.

Additionally, this case has stripped Mr. Murillo of his livelihood. Drug-dealing is Mr. Murillo's profession, his occupation, his trade. His ties to the community extend only as far as his exploitation of its residents. Without the ability to profit off of the addiction that keeps money flowing into his pocket, Mr. Murillo has little incentive to remain here and to answer for his offenses.

Finally, there is likely no viable place to which Mr. Murillo can be released. Mr. Murillo was potentially living in a studio apartment with others and at least two of the men who were living there have also been arrested on drug-related crimes and taken into county custody.

## IV. CONCLUSION

For the reasons set forth above, Mr. Murillo is a danger to the community and a flight risk. The government respectfully requests Mr. Murillo be detained pending trial.

DATED: June 26, 2022                                          Respectfully submitted,

                                                                                                 STEPHANIE M. HINDS
United States Attorney

*Christa Hall*
CHRISTA HALL
Assistant United States Attorney

U.S. DETENTION MEMO                    10
3:22-mj-70795-MAG